CARMEN NÚÑEZ MÉNDEZ VDA. DE ANDINO, ETC., demandantes y recurrentes, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrida.

*Número:* R-62-270 *Resuelto:* 16 de febrero de 1966

*Ángel Manuel Ciordia,* abogado de los recurrentes; *José Antonio Arabía,* abogado de la recurrida.

Sala Segunda integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Santana Becerra, Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Un obrero se electrocutó y murió en el curso del trabajo. El Fondo del Seguro del Estado desembolsó la cantidad de $3,693.34 por concepto de compensación y gastos relacionados con la muerte, y bajo las disposiciones del Art. 31 de la Ley

de Compensaciones por Accidentes del Trabajo, se subrogó e interpuso demanda en representación de la viuda, de tres hijos menores del obrero y de la madre de éste contra la Autoridad de las Fuentes Fluviales de Puerto Rico. Alegó que el accidente que causó la muerte se debió única y exclusivamente a la culpa, negligencia y descuido de la Autoridad en no tener debidamente protegidos los cables eléctricos de alta tensión estando éstos situados en un sitio y a una altura que dieron motivo al accidente.

La demandada negó los hechos y alegó que el accidente se debió en su totalidad "o casi en su totalidad" a la negligencia del conductor del vehículo que vino en contacto con los cables de alta tensión al conducir dicho vehículo atolondrada, imprudente y temerariamente permitiendo que entrara en contacto con los referidos cables, o a dicha negligencia y la negligencia concurrente del obrero fallecido. Después de una vista en los méritos en que se practicó una extensa prueba, gran parte de ella de carácter pericial, la Sala de San Juan del Tribunal Superior dictó sentencia declarando sin lugar la demanda.

La Sala sentenciadora formuló las siguientes determinaciones de hecho:

"Que para el día 20 de febrero de 1957, Rafael Andino Cruz tenía 21 años de edad y estaba casado con Carmen Núñez Méndez, de cuyo matrimonio habían procreado tres hijos de nombres, Edwin Rafael, Luis Enrique y Maribel Andino Núñez, el primero de año y medio de edad, el segundo de seis meses y la menor no había nacido todavía siendo hija póstuma.

"Que para esa fecha el obrero fenecido trabajaba como ayudante de su tío Pedro Cruz Pinto en un camión equipado con una 'torre' para subir concreto propiedad de Maximino Ferrán Marrero.

"Que la 'torre' instalada en el camión tenía una altura de alrededor de 35 pies y podía recogerse en su posición normal hasta una altura de aproximadamente 10 pies.

"Que para esa misma fecha se fabricaba la segunda planta de un edificio en construcción en un solar que queda contiguo a

otro edificio que hace esquina y que forma una 'T' en las calles Comerío y Olivero de Bayamón. Que el mencionado edificio de esquina, para esa época, tenía una planta dando por su lado norte hacia la calle Olivero, por su lado este a la calle Comerío, por su lado sur al edificio en construcción y por el lado oeste a un solar desocupado, cuyo frente dá hacia la calle Olivero extendiéndose dicho solar hasta la parte posterior del edificio en construcción.

"Que aun cuando el solar en el cual se encuentra el edificio esquina tiene una clasificación de comercial I, el que le sigue, o sea, el solar desocupado está clasificado como residencial y los demás solares que le siguen están edificados con casas de una sola planta construídas de madera y techadas de zinc.

"Que Rafael Andino Cruz como obrero auxiliar de equipo pesado ganaba de $40 a $50 semanales y usaba su ingreso en el sostenimento de su hogar, además ayudaba a su señora madre con $3 o $4 semanales.

"Que el día 19 de febrero de 1957, como a las 5 de la tarde, Pedro Cruz Pinto, chofer del equipo pesado propiedad de Maximino Ferrán Marrero, y su auxiliar Rafael Andino Cruz, llevaron el camión 'torre' al patio de la propiedad de Carmelo Martínez, situado en la calle Comerío de Bayamón. Dicho solar queda al lado sur de la calle Olivero. Esa misma tarde ellos montaron y prepararon la 'torre' que tenía 35 pies de alto en total, para usarla al otro día en la torta del edificio de dos plantas que se construía en el solar en la calle Comerío.

"Que aunque el maestro de obra testificó que de 3:30 a 4:00 de la tarde llamó desde la Farmacia Popular a la Autoridad de las Fuentes Fluviales para que tomaran precauciones [aunque no sabía la altura de la torre], lo cierto es que en las oficinas de la demandada no se registró dicha llamada, ni ella tuvo conocimiento de la forma y manera en que iban a realizar dicha labor.

"Que el día 20 de febrero de 1957, terminada la labor de subir concreto a la segunda planta del edificio en construcción, Pedro Cruz Pinto manipulaba el camión con la torre para sacarlo del solar y marcharse.

"Que el camión estaba en forma oblícua dentro del solar, con su parte trasera dando hacia el edificio en construcción y su parte delantera dando hacia la esquina derecha del frente del solar mirándolo desde la calle. La torre estaba a un ángulo de 90°, o sea,

en posición vertical y a una distancia de 25 pies de los alambres de la demandada, pero fue bajada hasta un ángulo de 45° quedando su extremo superior como a 30 pies del terreno y a la misma altura que los cables de la demandada. Estando en esta posición el chofer comenzó a caminar, perdió el control y las ruedas delanteras del camión se fueron hacia adelante, debido a un declive del terreno, y con su punta tocó un alambre de 4,600 voltios en el preciso momento en que Rafael Andino Cruz intentaba apresuradamente ponerle un calzo a las ruedas derechas traseras del camión para evitar que continuara deslizándose hacia adelante.

"Que al intentar ponerle el calzo, tocó el camión por su parte de metal, recibiendo una descarga eléctrica trasmitida a través de la torre, muriendo por electrocución poco después.

"Que las líneas de alambre eléctrico de la demandada, con las cuales hizo contacto la torre del camión, pasadas por la calle Olivero, eran de tres alambres portadores de una corriente de 4,600 voltios que partían desde un poste que se encontraba en la acera de la calle Comerío en el lado opuesto en que desembocaba la calle Olivero y aproximadamente en línea con el eje o centro de dicha calle Olivero. Este poste de la calle Comerío medía 45 pies de altura y sostenía, además de los alambres de la calle Olivero, alambres de otras líneas que corrían a lo largo de dicha calle Comerío. Los alambres de las líneas de la calle Olivero estaban en este poste a una altura de 38 pies y de dicho poste partían hacia otro que estaba situado en el lado afuera de la acera de 35 pies de altura y sostenido en crucetas a una altura de 28 pies 8 pulgadas de la acera. De los tres alambres de la línea uno estaba sostenido en el lado de adentro de la cruceta, o sea, al lado de la acera y dos en el lado de afuera de la cruceta. De este poste los alambres partían hasta un poste de 45 pies que estaba en la esquina de la acera formada por la intersección de la calle Olivero con la calle Ferrer. Este poste de 45 pies al igual que el primer poste de la línea, que como hemos dicho, se encontraba en la calle Comerío y al igual que los demás postes, eran postes de intersección de líneas, o sea, que sostenían distintas líneas que cruzaban. Los alambres de la línea de la calle Olivero en todos estos postes de intersección estaban a una altura de alrededor de 35 pies, ya que además de la línea de la calle Olivero sostenían otras líneas de menor voltaje que discurrían

por las otras calles y que deberían ir a menor altura pero nunca a menos de 20 pies.

"En el lugar en que la torre hizo contacto con los alambres de la línea de la calle Olivero estos se encontraban a una distancia horizontal de 47 pulgadas del solar desocupado y a más de 28 pies del suelo.

"Como la línea de la calle Olivero empezaba en un punto en la calle Comerío en la línea con el eje de dicha calle Olivero y de ahí partía adentrándose hacia la acera sur de la misma, quedaba un tanto oblícua en relación con la pared del edificio de esquina que da hacia la calle Olivero. Esto hace que la distancia más corta entre la mencionada línea y el edificio se encuentre frente a la esquina de dicho edificio que se forma con el solar desocupado y la calle Olivero. Así, de las líneas hasta la esquina de un alero que sobresale fuera de la pared de la segunda planta construída sobre el edificio después del accidente, hay una distancia de 67 pulgadas como dos pies más del alambre más cercano de la línea hasta la pared propiamente dicha en la esquina del edificio.

"El contacto entre la torre metálica y las líneas de la demandada ocurrió frente a un solar desocupado donde las líneas se encontraban a más de 28 pies de altura sobre el terreno lo que las coloca dentro de las normas de seguridad de el 'National Electrical Safety Code'. Éste recomienda una altura mínima vertical de 20 pies sobre el terreno para alambres portadores de corriente entre 750 a 15,000 voltios cuando cruzan sobre 'public streets, alleys or roads in urban or rural districts' y cuando dichos alambres corren a lo largo de vías públicas en áreas urbanas. El minimum de 20 pies de altura se ha fijado considerando que en el tránsito normal discurran vehículos hasta de una altura de 14 pies.

"Según el 'National Electrical Safety Code', las líneas eléctricas de voltajes inferiores a 8,700 voltios deberán estar a una separación horizontal de por lo menos 3 pies del edificio cuando este tiene una altura mayor que las líneas. De no poderse conseguir una separación horizontal de 3 pies o más, entonces deberán instalarse a una altura no menor de 8 pies sobre el edificio.

"Que Carmen Núñez Méndez Vda. de Andino, sus tres hijos menores, Rafael, Luis Enrique y Maribel Andino Núñez, y su señora madre, doña Emérita Cruz Pinto, sufrieron daños materiales, así como angustias mentales y espirituales por la muerte del obrero, Rafael Andino Cruz.

"Que el Fondo del Seguro del Estado pagó por compensación y gastos del obrero fenecido, la suma de $3,693.34, subrogándose en dicha cantidad en esta acción según las disposiciones del Artículo 31 de la Ley # 45 de 1935, según enmendada posteriormente." (¹)

Hemos hecho un minucioso examen de la extensa y hasta cierto punto compleja prueba. Estamos conformes con la Sala sentenciadora en que hubo negligencia y falta de precaución por parte del operador del camión-torre cuando se produjo el contacto. La prueba demuestra que no se calculó debidamente la altura y la posición a que debía colocarse la torre antes de moverse o manipularse el camión dentro del predio con el fin de sacarlo a la calle. Pero a pesar de la culpa del conductor, a la luz de la prueba en el récord esa no fue la sola, toda y única culpa envuelta en el accidente. El récord demuestra que en parte también hubo culpa de la demandada. La línea de 4,600 voltios a lo largo de la calle Olivero partía, a la altura de 38-1/2 pies, de un poste sito en la Calle Comerío, y se mantenía a lo largo de la calle Olivero a una altura de 33 pies y a 6 pies 7 pulgadas separada de la línea de edificación. En el sitio del accidente, la demandada mantenía la línea a una altura de cruceta de sólo 28-1/2 pies, 27 pies cinco pulgadas en el sitio mismo del contacto, y mantenía la separación a la línea de edificaciones en ese sitio a sólo 47 pulgadas.

---

(¹) De la extensa prueba practicada tanto oral como documental, fotografías, planos, dibujos, surgen otros hechos que son pertinentes, a los cuales nos referiremos.

Las partes están conformes en las siguientes correcciones: (1) El poste de la calle Comerío tenía 45 pies de largo, y no de altura, de los cuales 6 pies estaban enterrados, quedando los alambres a 38 pies de altura. (2) El primer poste de la calle Olivero (próximo al accidente) tenía 35 pies de largo, no de altura, 6 estaban enterrados y los alambres quedaban a 28-½ pies (altura de cruceta). (3) Los demás postes de la calle Olivero eran de 40 pies de largo, no de alto y sostenían el alambre a 33 pies.

Según plano y medidas de la demandada, la altura del alambre en el sitio exacto del contacto (no a la cruceta) era de 27 pies 5 pulgadas.

Hay prueba en el récord de que en el año 1945 la demanda-
da cambió los postes de la calle Olivero, quedando esta línea
a mayor altura y mayor separación de las edificaciones. La
prueba indica que el poste junto al accidente no se cambió.
Se explicó que no se trataba de un poste de intersección.
Cualquiera que fuera la razón, esos hechos demuestran que la
norma de seguridad considerada por la propia demandada
en ese sector, a la luz de todas las circunstancias, era la altura
mayor de 33 pies para un alambre no protegido con cubierta y
la separación mayor a 6 pies de las casas. El récord no de-
muestra que existieran razones técnicas o de funcionamiento
que obligaran a la demandada mantener la línea más baja y
más cerca de las edificaciones en ese sitio específico. De la
manera en que la prueba describe que ocurrió el accidente y
como lo creyó probado la Sala, resulta un hecho indisputable
que de haber estado la línea en ese sitio a la misma altura y
separación que tenía la línea en el resto de la calle, no habría
habido contacto a pesar de la falta de precaución que hubo
en cuanto a la torre al manipularse el vehículo.

Sostuvo la Sala sentenciadora en sus conclusiones de de-
recho que esta mayor o menor altura nada tenía que ver. Que
cuando las compañías de energía eléctrica colocan sus líneas
sobre postes en las vías públicas solamente pueden prever y
anticipar la presencia en las calles de personas que usan la
vía pública en la forma usual y corriente en que lo hacen los
transeúntes y conductores de vehículos, esto es, tramitar y
transitar por ellas; que en el área donde ocurrió el accidente
la demandada no podía esperar o anticipar que sus líneas fue-
ran alcanzadas por una torre de un camión en sitio donde nor-
mal y corrientemente no es desarrollaba actividad alguna y
menos aún la actividad relacionada con la construcción de un
edificio; que la demandada no podía prever que un camión con
una torre elevada a 30 pies se usara para servir concreto en
la fabricación de una casa en el sitio donde se encontraba
el camión, ni podía prever que se operara en la forma en que

ocurrió; que aun cuando la demandada hubiera sido negligente en mantener su línea en aquel sitio en la forma dicha, tal negligencia no fue la causa próxima del accidente sino un agente interventor e independiente.

A la luz del récord, no podemos convenir con la Sala sentenciadora en su conclusión de que en el lugar, sitio y circunstancias allí presentes, la demandada no podía prever ni anticipar los hechos que ocurrieron a los efectos del mantenimiento de sus líneas no aisladas en forma que evitara accidentes. Se trata de un sector que es parte comercial y parte residencial. El edificio que se construía estaba ubicado precisamente en un sector comercial, calle Comerío. El camión se situó en un espacio desocupado contiguo al edificio en construcción, propiedad del mismo dueño, que se extiende hasta la calle Olivero, paralela a la Comerío. Tomado en conjunto todo el sector, no era ésta un área apartada o donde no fuera probable o predecible toda esa actividad de desarrollo y de construcción que se extiende por doquier en la zona metropolitana, dentro del presente fenómeno de desarrollo y expansión general que ocurre en Puerto Rico. Uno de los sitios donde más expansión y desarrollo ha habido en cuanto a la actividad de construcción es la ciudad de Bayamón. Quizás a ello se deba que desde el 1945 la demandada puso postes más largos en esa calle que aquél cercano al accidente, e instaló la línea a aquella altura, que en su propio criterio era la de razonable seguridad. Es significativo que al mes del accidente la demandada dejó de usar el poste más bajo de 35 pies y lo sustituyó con uno de 40 pies igual a los demás, quedando entonces la línea de 4,600 voltios a igual altura y separación que en el resto de la calle. Era previsible no sólo el uso de la calle por peatones o vehículos, sino también por maquinaria movible de construcción, según usos de nuestros tiempos.

En su aspecto de derecho este caso se gobierna por las normas doctrinales que con extrema claridad expuso el Juez Sr. Pérez Pimentel en *Ginés Meléndez* v. *Autoridad de*

*Acueductos*, 86 D.P.R. 518 (1962). Ante situación de derecho parecida a la que ahora damos consideración, expone *Ginés* que no hay una regla exacta para determinar cuando las causas de un accidente son próximas y cuando son remotas y cada caso debe ser resuelto tomando en consideración sus hechos y circunstancias especiales; una causa interventora es aquélla que participa activamente en producir el resultado después que ha ocurrido la negligencia u omisión del actor. Ordinariamente un demandado no queda relevado de responsabilidad por una causa interventora que razonablemente pudo ser prevista, ni por una que sea un incidente normal del riesgo creado. Un demandado será relevado de responsabilidad por una causa interventora imprevisible y anormal que produce un resultado que no pudo ser previsto. El mero hecho de que haya un acto de un tercero interventor, no convierte la actuación del actor en una causa remota, si éste pudo o debió haber previsto esta intervención. Una fuerza nueva imprevisible rompe la cadena de causalidad, así, cuando el acto voluntario de una persona responsable se interpone entre la conducta negligente del demandado y el daño sufrido por el demandante, el problema de previsibilidad es el mismo y puede servir de medida para determinar si la conducta del demandado es una de las causas próximas del accidente. Se dice también en *Ginés* de particular aplicación en este caso dado el criterio expuesto por la Sala sentenciadora, que la regla de anticipar el riesgo no se limita a que el riesgo *preciso* o las consecuencias *exactas* arrostradas debieron ser previstas. Lo esencial es que se tenga el deber de prever *en forma general* consecuencias de determinada clase: No es defensa alegar que no se pudo prever el *curso preciso* o toda la extensión de las consecuencias, siendo de esa clase que, como cuestión de hecho, ocurrieron. También que un demandado es responsable si su negligencia es un causa próxima del daño aunque no sea *la única* causa próxima de tal daño. La responsabilidad no depende de si en el ejercicio de razonable diligencia el deman-

dado previó o debió prever el daño específico reclamado, pero la parte acusada de negligencia puede ser responsable de cualquier cosa que después de completado el daño aparezca ser una causa natural y probable de su acto u omisión. Es innecesario, por lo tanto, que el demandado haya anticipado el daño *específico* imputádole o que haya anticipado que dicho daño iba a ocurrir en la *forma precisa* en que ocurrió.

Esos principios así expuestos en *Ginés* rigen la norma de derecho en este caso. Es también de aplicación lo resuelto en *Vda. de Dávila* v. *Fuentes Fluviales*, 90 D.P.R. 321 (1964).

 En este caso hubo culpa del patrono del obrero como principal por la negligencia de su otro empleado, el conductor del camión. La muerte fue un accidente del trabajo. Bajo el régimen de la Ley de Compensaciones por Accidentes del Trabajo su patrono asegurado no le responde al obrero por el accidente, aunque medie negligencia. Art. 20, Ley Núm. 45 de 18 de abril de 1935. Véase: *Cortijo Walker* v. *Fuentes Fluviales*, 91 D.P.R. 574 (1964). No podía ser aquí el patrono un codemandado directo, ni respondería de manera indirecta como un tercero demandado, ni podría la demandada resarcirse luego del patrono como un colaborador con ella del daño. (²) La inmunidad contra responsabilidad en daños de un patrono *asegurado*, por su culpa, es absoluta bajo el plan integral de funcionamiento de la ley que provee compensación por el accidente del trabajo.

En consecuencia a lo expuesto, rigiéndose este caso por ley especial en ese aspecto, a la demandada debe imponérsele

---

(²) G. Marty, *Derecho Civil*, Tomo 1—Obligaciones—pág. 410, Delitos y Cuasidelitos. "Hay pluralidad de responsables en dos casos. Primer caso: Cuando el daño ha sido causado en colaboración por dos o varios responsables. En este caso la víctima tiene, como hemos dicho, una acción contra cada uno de los responsables por el total, hasta ser completamente indemnizada. (*Obligación in solidium.* . . .) Pero una vez indemnizada la víctima quien ha pagado tiene una acción contra los demás responsables y debe repartirse entre ellos la carga del daño. Es esto lo que ha hecho la jurisprudencia tomando en consideración la gravedad de las culpas." Cf. *Rivera* v. *Great American Indemnity Co.*, 70 D.P.R. 825 (1950).

la obligación de resarcir el daño sólo en proporción a su propia culpa y al grado en que colaboró a producirlo. Considerando dicha proporción y grado a la luz de todos los hechos y circunstancias del récord, la demandada debe responder en una suma no mayor de $23,000 para todos los demandantes, a ser repartida en proporción de cinco doceavas (5/12) partes para la viuda del obrero, una doceava (1/12) parte para la madre y dos doceavas (2/12) partes para cada uno de los tres hijos, del sobrante que hubiere luego que el Fondo demandante se hubiera resarcido de sus desembolsos según provisto por ley. Se imponen a la demandada las costas y el pago de la cantidad de $1,500 por concepto de honorarios de abogado.

*Se dictará sentencia de conformidad revocando la de la Sala sentenciadora que desestimó la demanda.*