JOSÉ R. MÉNDEZ PURCELL ET AL., demandantes y recurridos, *v.* AUTORIDAD DE LAS FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrente.

*Número:* R-78-355      *Resuelto:* 26 de junio de 1980

---

*Luis A. Lugo,* abogado de la recurrente; *Rolando Emmanuelli Sepúlveda,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR MARTIN emitió la opinión del Tribunal.

Sebastián Méndez Bonnin, quien contaba entonces 18 años de edad, condujo hasta el patio de su hogar un arrastre (*trailer*) en el que transportaba un bote de su propiedad. Al momento de los hechos el joven Méndez Bonnin residía en el Reparto Anaida de la ciudad de Ponce. Allí lo colocó en cierto lugar cerca de la colindancia del solar, por donde discurría, a una altura de 18 pies y dos pulgadas, un tendido de cable eléctrico de alto voltaje, propiedad de la demandada Autoridad de las Fuentes Fluviales. Acto seguido se dispuso a erguir sobre la pequeña embarcación un mástil de aluminio de die-

ciséis pies de altura para colocarlo en el correspondiente hueco del bote. Hacía mucho sol y no había llovido.

Con tal propósito, junto al joven Héctor Javier Jiménez y otro amigo que le asistía, [1] subió Méndez Bonnin a la lancha de cuatro pies de alto, levantaron en alto el mástil de dieciséis pies, lo que resultó en una altura total, entre bote y mástil, de 20 pies, procediendo con la operación planeada. Es lógico concluir que para insertar el mástil en el hueco habrían tenido que levantar el mástil aún a mayor altura. El juzgador concluye que "tomaron precauciones, miraron hacia arriba, y lo levantaron". Al así actuar, los jóvenes notaron la cercanía de los cables de energía y, conscientes de la peligrosidad que los mismos representaban para su seguridad física, intentaron alzar el palo. Sin embargo, la suerte les fue adversa y al hacer contacto el mástil con las líneas de energía, prodújose una fuerte descarga eléctrica que causó inconsciencia, quemaduras y muy serias lesiones tanto al joven Méndez Bonnin como a Héctor Javier Jiménez. Sus familiares cercanos padecieron las angustias que este tipo de accidente suele suscitar [2] e incurrieron en gastos en la atención de las lesiones de aquéllos. Para el resarcimiento de los daños sufridos por unos y otros, los padres de los jóvenes entablaron acción civil ante la Sala de Ponce del Tribunal Superior.

Celebrado el juicio y estimada la demanda, el Tribunal Superior valoró los daños sufridos por los demandantes en $233,699.78, [3] mas entendiendo el juzgador que se trataba

---

[1] Héctor contaba entonces con 16 años de edad, al igual que el amigo.

[2] Véase *Moa* v. *E.L.A.*, 100 D.P.R. 573, 587 (1972).

[3] No nos parece que la estimación de los daños que hiciera el tribunal sentenciador fuera claramente errónea o exagerada, por lo cual no debemos intervenir con su criterio. *Rodríguez* v. *American Railroad Co.*, 43 D.P.R. 493, 504 (1932); *Baralt* v. *Báez*, 78 D.P.R. 123, 127 (1955). En este sentido, véase la relación que hace don Manuel Rodríguez Navarro de las sentencias del Tribunal Supremo de España que se refieren a la estimación de la cuantía de los daños y la intervención que es propia en segunda instancia. *Doctrina Civil del Tribunal Supremo*, Madrid, Aguilar, S.A., 1951, T. IV, pág. 5883 *et seq.* Véase A. Orgaz, *El daño resarcible*, Buenos Aires, Bibliográfica Omeba, 1960, pág. 141 *et seq.*

de un caso en el que concurrieron actos negligentes tanto de parte de la Autoridad demandada como de los jóvenes lesionados distribuyó la responsabilidad de una y otra parte en 30 y 70 por ciento respectivamente. Insatisfecha la demandada con el grado de responsabilidad que se le ha impuesto, ha acudido ante nos y sostiene que se trata de un accidente desgraciado en el que no medió negligencia de su parte.

Atendiendo las doctrinas jurídicas rectoras de la controversia, dictamos resolución requiriendo de los recurridos que mostraran causa por la cual no debía expedirse el auto de revisión para reducir el grado de negligencia imputable a la demandada. Comparecieron los recurridos oponiéndose a la reducción sugerida, y luego replicó la recurrente insistiendo en que no debe ser responsabilizada por el accidente. Los argumentos de las partes no nos persuaden a variar la actitud previamente intimada. Veamos.

I

La prueba que desfiló en corte demuestra que en el lugar donde ocurrió el accidente el tendido eléctrico no estaba a una altura adecuada. Los especialistas en las ciencias eléctricas recomiendan que en lugares donde hay circulación vehicular —calles públicas, callejones, o entradas a garages residenciales, como sucedía en el caso de autos— la elevación prudente de la cablería de alto voltaje debe ser no menor de veintidós pies.[4] *National Electric Safety Code*, ed. 1977, págs. 116–117.[5] *Vda. de Andino* v. *A.F.F.*, 93 D.P.R. 170 (1966).

---

[4] Aunque antes del desarrollo de la urbanización donde ocurrieron los hechos los cables estaban a la altura adecuada, al nivelarse los terrenos quedó reducida la altura a 18'2".

[5] El Reglamento de Lotificación vigente al momento de los hechos disponía: "Se proveerán todas las líneas eléctricas, postes, vientos, transformadores, interruptores, y demás artefactos necesarios para un sistema completo de distribución eléctrica, y de alumbrado de calles a base de líneas subterráneas, con miras a afrontar la demanda de la lotificación cuando ésta haya sido ocupada totalmente. Tales instalaciones se levantarán en forma que satisfagan o se ajusten a los requisitos del 'National Electrical

No puede establecerse categóricamente que el accidente que motivó este pleito no hubiera sucedido de haber estado los alambres de energía a la altura requerida, puesto que el bote tenía 4 pies de alto, el mástil 16 pies adicionales, y es de presumir que los menores que levantaban el mástil tendrían que necesariamente alzarlo un poco más para lograr entrarlo en el hueco. No obstante, sí se puede sostener que las probabilidades de que ocurriera hubiesen sido mucho menores. No dudamos, por tanto, que procede imponer responsabilidad a la demandada por los sucesos que motivaron el caso de autos. C. Rogel Vide, *La responsabilidad civil extracontractual*, Madrid, Ed. Civitas, 1977, págs. 66–68. Aunque las entidades que trafican con energía eléctrica no son aseguradoras de todo daño que su industria cause —*Santos Ocasio* v. *A.F.F.*, 103 D.P.R. 564, 566 (1975)— deben ejercitar un alto grado de cuidado atendiendo la peligrosidad del producto con que negocian. *Burgos Quiñones* v. *Autoridad Fuentes Fluviales*, 90 D.P.R. 613, 619 (1964); *Ramos* v. *Aut. Fuentes Fluviales*, 86 D.P.R. 603, 609 (1962); *Matos* v. *P.R. Ry., Lt. & P. Co.*, 58 D.P.R. 160, 164 (1941). Véase *Figueroa* v. *P.R. Ry., Light & P. Co.*, 66 D.P.R. 488 (1946).[6]

■    De otra parte, sin embargo, resalta con relieve el elemento culposo y negligente en las actuaciones de los jóvenes perjudicados. Jóvenes de madurez intelectual que cursaban

---

Code' y de la entidad que suministre la luz y energía eléctrica local, y según las apruebe la Junta". 23 R.&R.P.R. sec. 10–304.

[6] Conviene señalar que no es exclusiva de nuestra jurisdicción la norma legal que requiere esa rigurosa diligencia en el manejo de los cables eléctricos. Pueblos de Europa y de América, cuyas aspiraciones de justicia mucho se asemejan a las nuestras, han procedido en forma similar no empece a que sus ordenamientos jurídicos formen parte de disímiles tradiciones. Así, en cuanto a aquellas donde priva la tradición civilista romano germánica, véase F. F. Stone, *Louisiana Civil Law Treatise*, St. Paul, Minn., West Publishing Co., 1977, Vol. 12, §§ 395–396, págs. 519–521. En cuanto a aquellas jurisdicciones donde opera el sistema de derecho anglosajón, consúltese Harper & James, *The Law of Torts*, Boston, Little Brown and Co., 1956, Vol. 2, § 14.4, pág. 798 *et seq.*; J. A. Dooley, *Modern Tort Law*, Chicago, Callaghan and Co., 1977, Vol. 2, § 32.41, pág. 301.

escuela superior y de juicio suficiente para transportar y para manejar un bote, advirtieron la presencia sobre ellos de cables eléctricos. (7) Reconocieron la peligrosidad que ellos representaban, al tomar las precauciones y mirar hacia arriba, según reseña el juzgador. Aun así decidieron erigir un mástil metálico, conscientes de la posibilidad de tocar los cables eléctricos, pero confiando en que no alcanzaría las líneas. (8) Fueron en extremo negligentes. A personas razonables y sensatas es justo requerirles un grado mucho mayor de diligencia en tales circunstancias. J. Santos Briz, *La Responsabilidad civil*, 2da. ed., Madrid, Ed. Montecorvo, S.A., 1977, pág. 43.

## II

El elemento de negligencia distingue en este caso los actos de la parte demandante así como el proceder de la parte demandada. Se impone la determinación de responsabilidad comparada. Corresponde, pues, a los tribunales la difícil tarea de arbitrar una solución para establecer en qué medida la víctima deber ser indemnizada —A. Cammarota, *Responsabilidad extracontractual*, Buenos Aires, Ed. Dapalma, 1947, T. 1, págs. 330–331, 336–337— para lo cual, con sano juicio, la doctrina, atendiendo a la norma alemana, manda analizar todas las circunstancias fácticas; en particular, si ha habido

(7) El mayor de ellos, Méndez Bonnin, que entonces contaba diez y ocho años, vivía en el sitio donde llevaban a cabo la operación de la montura del mástil. Luego, sabía que allí estaban los cables eléctricos de alto voltaje.

(8) Es científicamente inatendible la teoría de los demandantes a los efectos de que el palo nunca tocó los cables y de que la corriente eléctrica de 38,000 voltios saltó un espacio aéreo de dos o tres pies. Desde una perspectiva técnica y científica, quedó demostrado en instancia que el aire es excelente aislador y dieléctrico, necesitándose alrededor de 75,000 voltios para que la electricidad salte un espacio de una pulgada a través del aire. C. L. Dawes, *A Course in Electrical Engineering*, Nueva York, McGraw-Hill, 1952, Vol. 1, pág. 332. Véase *Burgos Quiñones* v. *Autoridad Fuentes Fluviales*, 90 D.P.R. 613, 620–621 (1964).

una causa predominante. J. Santos Briz, *op. cit.*, págs. 107–108.

■ Precisa señalar, además, que en el proceso de fijar los correspondientes por cientos de responsabilidad a las partes concernidas por los daños sufridos, los tribunales deben tener presentes las guías comparables con los hechos específicos que tienen ante sí. Esto es, una vez determinada cuál es la correcta sucesión de eventos, los jueces de primera instancia deben hacer referencia a la doctrina jurisprudencial con ánimo de compararlos con casos similares que hayan pautado la distribución equitativa de responsabilidad. De existir esos precedentes, deben utilizarse como base; y deben honrarse siempre y cuando no se demuestre claro error en su contenido normativo o que en el caso en consideración intervienen circunstancias que lo distinguen de la jurisprudencia normativa. Sólo así puede alcanzarse la meta de la jurisprudencia de ofrecer un tratamiento similar a los litigantes que se hallan en circunstancias similares. Véanse: R. B. Cappalli, *Tort Damages in Puerto Rico*, 46 Rev. Jur. U.P.R. 241, 299 (1977); R. E. Bernier, *La cuantía de los daños*, en *Apuntes legales*, Puerto Rico, 1968, págs. 107–110. Véanse también, J. Puig Brutau, *La jurisprudencia como fuente del derecho*, Barcelona, Bosch, 1951; R. David, *Los grandes sistemas jurídicos contemporáneos*, Madrid, Aguilar, 1969, pág. 100 *et seq.*

Al menos dos opiniones de este Tribunal son ilustradoras en la resolución del presente caso. Éstas son *Vda. de Dávila* v. *Fuentes Fluviales*, 90 D.P.R. 321 (1964), y *Rosario Crespo* v. *A.F.F.*, 94 D.P.R. 834 (1967).

En *Vda. de Dávila*, supra, el operador de una máquina industrial murió por electrocución cuando una torre del aparato vino en contacto con alambres eléctricos de alto voltaje. 90 D.P.R., pág. 323. Notamos allí que a la compañía suministradora de energía se le había requerido con alguna antelación que removiera las líneas eléctricas por cuanto se reali-

zaba la construcción de un caserío —90 D.P.R., págs. 324–325— y sostuvimos que la compañía proveedora actuó negligentemente al no tomar precauciones para reducir la peligrosidad en un área de construcción donde es usual la utilización de equipo de considerable elevación. 90 D.P.R., pág. 326. No obstante, resolvimos que la imprudencia del perjudicado al operar la maquinaria, conociendo la presencia del tendido y el consiguiente peligro que el mismo representaba, lo responsabilizaba en un ochenta por ciento de los daños sufridos. 90 D.P.R., págs. 328–329.

Y en *Rosario Crespo*, supra, impusimos alguna responsabilidad a la compañía suplidora de energía por no tomar precauciones aumentando la elevación de los cables eléctricos que discurrían por un área de construcción. 94 D.P.R., pág. 849. No obstante haber hallado responsabilidad, al igual que en *Vda. de Dávila*, la redujimos a un veinte por ciento al advertir que los lesionados no tomaron precaución alguna para evitar que ciertos instrumentos de medición de considerable altura que utilizaban, vinieran en contacto con las líneas eléctricas que se hallaban a la vista y cuya presencia advertían. 94 D.P.R., págs. 848–849.

Salta a la vista que la doctrina de *Vda. de Dávila*, supra, es de estricta aplicación a los hechos del caso ante nos, debiendo privar, por tanto, sobre esta controversia los criterios allí expuestos. En éste, como en los dos casos citados precedentemente, la imprudencia de los lesionados y su conducta irreflexiva les responsabilizan preponderantemente, y comoquiera que los hechos probados no ameritan distinguir este caso de los mencionados, resolvemos que la negligencia concurrente de la compañía suplidora de electricidad debe reducirse del treinta al veinte por ciento.

*Por tales fundamentos, se dictará sentencia modificando la recurrida para ajustar las partidas que debe satisfacer la demandada conforme al por ciento de responsabilidad aquí fijado. Así modificada, será confirmada.*

El Juez Presidente Señor Trías Monge emitió opinión disidente. Los Jueces Asociados Señores Díaz Cruz e Irizarry Yunqué no intervinieron.

—0—

Opinión disidente del Juez Presidente, Señor Trías Monge.

San Juan, Puerto Rico, a 26 de junio de 1980

Me preocupa la creciente intervención de este Tribunal con las funciones tradicionales del Tribunal de Primera Instancia en la fijación de daños. Las reglas sobre el particular son conocidas. El Tribunal Supremo puede evaluar independientemente el testimonio de peritos. *Urrutia* v. *A.A.A.*, 103 D.P.R. 643 (1975). Las determinaciones en primera instancia fundadas en otra prueba, sobre la cuantía de los daños, no deben ser alteradas, sin embargo, excepto cuando la compensación fijada sea manifiestamente errónea o seriamente exagerada. *Rodríguez* v. *American Railroad Co.*, 43 D.P.R. 493, 504 (1932); *Baralt* v. *Báez*, 78 D.P.R. 123, 127 (1955).

El repudio de estas sanas normas, en la teoría o en la práctica, pueden deformar los papeles que desempeñan en nuestro sistema de justicia el Tribunal de Primera Instancia y el Tribunal Supremo. Un estudio reciente del Profesor Richard B. Cappalli revela datos alarmantes. De 1936 a 1959 el Tribunal Supremo examinó, a solicitud de parte, los daños concedidos en 79 pleitos. El Tribunal confirmó la cuantía fijada en 63 casos, limitándose a reducirla en ocho y a aumentarla en igual número. De 1960 a 1977, no obstante, la situación ha cambiado dramáticamente. Se revisaron 56 casos y se confirmaron tan solo dieciséis. El Tribunal redujo los daños en 31 ocasiones y en nueve los aumentó. Cappalli, *Tort Damages in Puerto Rico*, 46 Rev. Jur. U.P.R. 241, 296–97 (1977).

Las determinaciones del Tribunal Superior en este caso, reforzadas por una inspección ocular, hallan suficiente apoyo

en la prueba. El hecho de que este Tribunal ha fijado en dos casos similares la responsabilidad de Fuentes Fluviales en modo análogo al establecido en la opinión mayoritaria, no priva al Tribunal Superior de su poder de fijar un porcentaje distinto de negligencia a base de variantes en el peso de la prueba desfilada ante él. Disiento respetuosamente de la acción del Tribunal al decretar una reducción en la responsabilidad de Fuentes Fluviales de 30% a 20%.