ABELARDO TORRES SOLÍS ET AL., demandantes y recurridos, *v.* AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO y OTRA, demandados y recurrente la primera; PUERTO RICO TELEPHONE CO., tercero demandado y recurrido y demandante contra tercero, *v.* VOLT INFORMATION SCIENCE, INC. y OTRA, terceros demandados.

*Números:* RE-91-109 CE-91-91

*Resueltos:* 7 de junio de 1994

304

*E. Vázquez Otero*, abogado de los recurrentes; *Álvaro R. Calderón, Jr.*, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El 27 de junio de 1987, Abelardo Torres Solís y Roberto Irizarry —empleados de Voltecon, subcontratista de la Puerto Rico Telephone Company (en adelante la Telefónica)— se dirigieron a instalar unas líneas telefónicas frente al Residencial Los Mirtos en Carolina. La instalación re-

quería tender unos cables telefónicos en algunos postes mediante el permiso de la Autoridad de Energía Eléctrica (en adelante la Autoridad) y en virtud de un convenio suscrito con la Telefónica.

Iniciaron las labores e instalaron las líneas sin problemas en dos postes de la Telefónica, en los cuales sólo había líneas telefónicas. T.E., pág. 11. Sin embargo, en el tercer poste, propiedad de la Autoridad, existían unas líneas eléctricas y de teléfono sobre un transformador instalado a una altura aproximada de doce (12) pies, en violación del Código Telefónico Nacional y del Código de Seguridad Eléctrico Nacional. En situaciones normales, el transformador debe estar a una altura mínima de dieciocho (18) pies, y las líneas telefónicas por encima, a una distancia no menor de treinta (30) pulgadas de las eléctricas. T.E., págs. 50–51.

Torres Solís e Irizarry se percataron de esa situación, pero asumieron que no habría problemas al instalar el cable a esa misma altura y localización. Para fijarlo, Torres Solís colocó de manera inclinada la escalera contra el poste, en el lado opuesto al del transformador, cogió el cable con la mano derecha, subió y, al proceder a cambiar "el cable de la mano derecha hacia la mano izquierda ... si[ntió] *como una corriente* o algo que [se] atrae hacia el transformador y de momento [va] hacia atrás de cantazo y cae". (Énfasis suplido.) T.E., págs. 13–14. Con la caída su cuerpo asumió una posición fetal, quedó contraído, con convulsiones y sin poder hablar. Su compañero Irizarry, junto a otras personas, lo trasladaron al Hospital de Área de Carolina para que recibiera los primeros auxilios. Posteriormente, fue referido al Centro Médico donde permaneció hospitalizado durante dieciocho (18) días en la Unidad de Cuidado Intensivo para pacientes quemados.

Torres Solís experimentó quemaduras de segundo grado con penetración de la piel en la parte inferior del brazo izquierdo. También, en la mayor parte del pecho y el abdomen con grandes áreas en "carne viva". Por la caída sufrió

una torcedura (*sprain*) de los músculos de la espalda y quedó inmovilizado durante los primeros ocho (8) días de su convalecencia. El tratamiento consistía en limpiarle y frotarle las quemaduras dos (2) veces al día para extraer el tejido muerto y propiciar la curación. Esas lesiones y el tratamiento le produjeron dolores severos; las quemaduras le dejaron cicatrices y continúa padeciendo de la espalda.

Torres Solís dejó de percibir unos doscientos dólares ($200) semanales durante dieciséis (16) semanas. Al serle imposible desempeñarse en las mismas labores, perdió su trabajo. Al presente realiza limpieza de oficinas, devengando sólo tres dólares con cincuenta centavos ($3.50) por hora.

Por este accidente Torres Solís, su esposa Elizabeth Márquez Carrasquillo y la sociedad legal de gananciales Torres-Márquez demandaron, en el Tribunal Superior, Sala de Carolina, a la Autoridad y su aseguradora C.N.A. Casualty Insurance Co. (en adelante C.N.A.). Éstas negaron toda responsabilidad y adujeron que Torres Solís incurrió en negligencia. La Autoridad formuló una demanda contra tercero en contra de la Telefónica y Royal Insurance Co. of America (en adelante Royal), predicada en que la Telefónica instaló los cables telefónicos en violación a las normas de seguridad. Éstas negaron esas alegaciones.

Las partes realizaron el descubrimiento de prueba y celebraron la Conferencia con Antelación al Juicio. Después, la Telefónica solicitó sentencia sumaria a su favor fundada en la inmunidad patronal de la Ley de Compensaciones por Accidentes del Trabajo. Discutida en cámara, se determinó que efectivamente gozaba esa inmunidad, pero que conforme a un Contrato de Uso Mancomunado de Postes Conjuntamente podía responderle a la Autoridad; por ende, permanecería en el pleito.

Posteriormente, la Autoridad adujo también ser patrono estatutario y que la Telefónica había renunciado contractualmente a su favor la inmunidad. Después de otros inci-

dentes, la Telefónica formuló una demanda contra tercero en contra de Volt y Royal. Torres Solís *et al.* se opusieron al argumentar que, de permitirse, provocaría una demora innecesaria.

El día del juicio, el Tribunal (Hon. Magalie Hosta Modestti, Juez) denegó un pedido de suspensión de la Telefónica, pues se le había "concedi[do] amplio tiempo para traer a dicha parte y estando el caso listo para comenzar a verse en sus méritos, en esta etapa del pleito provocaría la dilación de este litigio. La Puerto Rico Telephone Co. deberá litigar contra dicha parte [Royal], en pleito [ap]arte".(¹) Minuta de 20 de octubre de 1990, pág. 1.

Desfilada la prueba testifical y documental, dicho foro declaró con lugar la demanda y condenó a la Autoridad, a la Telefónica y a sus aseguradoras, C.N.A. y Royal, respectivamente, a pagarle solidariamente a Torres Solís ochenta mil dólares ($80,000), a su esposa Elizabeth veinte mil dólares ($20,000), cinco mil dólares ($5,000) de honorarios, más costas, gastos e intereses, estos últimos desde la fecha de la presentación de la demanda. Subsiguientemente, presentaron una reconsideración y una solicitud de determinación de hechos. La tercera demandada Royal pidió y fue relevada de la sentencia por ser la aseguradora de Volt, no de la Telefónica.

El 21 de febrero de 1991 la Telefónica nos presentó una petición de *certiorari* para revisar la resolución que dispuso la continuación de los procedimientos y argumentar que la tercera demandada Royal, parte indispensable, todavía no había contestado la demanda ni usado el descubrimiento de prueba, ni estaba presente el día del juicio. Caso Núm. CE-91-91. Cuestionó la negativa a desestimar por razón de la inmunidad patronal.

Por su parte, la Autoridad acudió en revisión. Señaló como errores la imposición de responsabilidad sin impu-

---

(¹) Este es el dictamen objeto del *certiorari*, Caso Núm. CE-91-91, que para fines dispositivos hemos consolidado con esta revisión.

tarle negligencia al demandante Torres Solís; concederle una cuantía excesiva por daños; no resolver su demanda contra tercero; imponerle temeridad, y denegar unas determinaciones de hecho y conclusiones de derecho.[2] Examinemos estos señalamientos.

## II

De entrada, carece de mérito la queja de la Telefónica de que el caso no estaba listo para ventilarse. Caso Núm. CE-91-91. La cronología procesal antes expuesta y el tiempo transcurrido derrotan su contención.

Ahora bien, tiene la razón en que es patrono asegurado estatutario y cubierto por la inmunidad, *frente a los reclamos del demandante Torres Solís et al.* Adelantamos, sin embargo, que esa inmunidad no se opone ante la Autoridad por razón contractual; oportunamente nos concentraremos en este último extremo.

■ Sabido es que un empleado accidentado en su trabajo no puede demandar en daños a su patrono asegurado bajo la Ley de Compensaciones por Accidentes del Trabajo. "La inmunidad contra responsabilidad en daños de un patrono *asegurado*, por su culpa, es absoluta bajo el plan integral de funcionamiento de la ley que provee compensación por el accidente del trabajo." (Énfasis en el original.) *Vda. de Andino v. A.F.F.*, 93 D.P.R. 170, 181 (1966). En otras palabras, no existe causa de acción. *Admor. F.S.E. v. Flores Hnos. Cement Prods.*, 107 D.P.R. 789, 792 (1978); *Cruz Rodríguez v. A.A.A.*, 101 D.P.R. 269, 270 (1973).

■ El único remedio disponible contra el patrono asegurado es el derecho a la compensación provista en dicho estatuto. Art. 20 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 21; *Santiago Hodge v.*

---

[2] Por el resultado al cual se ha llegado, este señalamiento se torna académico.

*Parke Davis Co.*, 126 D.P.R. 1 (1990); *Ruiz Díaz v. Vargas Reyes*, 109 D.P.R. 761, 764 (1980).

Ahora bien, cuando hay múltiples patronos la situación se presta a la confusión. "En *Lugo Sánchez v. A.F.F.*, 105 D.P.R. 861 (1977), reconocimos el desdoblamiento de la figura del patrono entre el *directo* y el *estatutario*, y la inmunidad que tanto al uno como al otro favorece cuando se hubiere cumplido por cualquiera de ellos con la exigencia del Art. 19 de la Ley, 11 L.P.R.A. sec. 20, de mantener sus obreros asegurados. Pero ni *Lugo Sánchez* ni sus derivados *Vda. de Costas v. P.R. Olefins*, 107 D.P.R. 782 (1978) y *Rodríguez v. Union Carb. Grafito, Inc.*, 107 D.P.R. 848 (1978), en riguroso acatamiento de los citados Arts. 20[, 11 L.P.R.A. sec. 21,] y 19 de la Ley, extendieron inmunidad a contratista o subcontratista que no es patrono, en calidad alguna, del obrero lesionado." (Énfasis en el original.) *Ruiz Díaz v. Vargas Reyes*, supra, pág. 764. Véase, también, *Soc. de Gananciales Maldonado v. E.L.A.*, 129 D.P.R. 961 (1992).

En este contexto, un contratista se denomina "patrono estatutario" para distinguirlo del subcontratista, quien es el "patrono contractual" o "real". *Lugo Sánchez v. A.F.F.*, 105 D.P.R. 861, 865 esc. 2 (1977); *Colón Santiago v. Comisión Industrial*, 97 D.P.R. 208, 209 (1969).

Más allá del ámbito patronal, la responsabilidad de un tercero quedó así aclarada en *Santiago Hodge v. Parke Davis Co.*, supra, pág. 9:

> No obstante, cuando la lesión, enfermedad o muerte que origina el derecho a la compensación del obrero ocurre en circunstancias que hacen responsable a un *"tercero"*, la Ley de Compensaciones por Accidentes del Trabajo no afecta la responsabilidad civil del causante del daño que es ajeno a la relación patrono-empleado. El estatuto no pretende extender la inmunidad contra reclamaciones de obreros a extraños. Véase 2A Larson's *Workmen's Compensation Law* Sec. 71.10 (1988). En esta situación se reconoce que tanto el obrero lesionado como el Fondo del Seguro del Estado, en subrogación por los

beneficios pagados al empleado, pueden reclamarle judicial-
mente al tercero. Art. 31 de la Ley de Compensaciones por Ac-
cidentes del Trabajo, 11 L.P.R.A. sec. 32. (Énfasis suplido.)

■ Si el dueño de una obra subcontrata los servicios
del patrono real del obrero accidentado, el contratante
principal o dueño no es un "tercero", sino un "patrono es-
tatutario" que goza de inmunidad al estar exento de asegu-
rar cuando el contratista independiente estuviera
asegurado. *Santiago Hodge v. Parke Davis Co.*, supra; *Ro-
dríguez v. Union Carb. Grafito, Inc.*, 107 D.P.R. 848,
849–850 (1978); *Vda. de Costas v. P.R. Olefins*, 107 D.P.R.
782, 785 (1978); *Lugo Sánchez v. A.F.F.*, supra.

■ Determinar si un demandado es o no "patrono es-
tatutario" conlleva examinar las relaciones contractuales
entre éste y el patrono real de los obreros. *Vda. de Costas v.
P.R. Olefins*, supra. "En ausencia de ese nexo jurídico que
relaciona al patrono directo del obrero con el causante de la
lesión en la *'obligación legal común'*, de asegurar al em-
pleado con el Fondo, estaremos ante el *'tercero'*, desprovisto
de la protección estatutaria contra demandas de obreros
lesionados en el trabajo." (Énfasis suplido.) *Santiago
Hodge v. Parke Davis Co.*, supra, pág. 12. Véase *Ruiz Díaz
v. Vargas Reyes*, supra.

Con estos pronunciamientos en mente, es obvio que Volt
y la Telefónica son patronos —directo el primero y estatu-
tario el segundo— *inmunes* frente a Torres Solís *et al.* No
así la Autoridad ni su aseguradora. *Ortiz v. Gobierno Mu-
nicipal de Ponce*, 94 D.P.R. 472, 476–477 (1967). Así acla-
rado, evaluemos la negligencia.

## III

■ Reiteradamente hemos reconocido el carácter inhe-
rentemente peligroso de la energía eléctrica y el deber que
tiene la Autoridad de cuidar y velar la construcción y el
mantenimiento de sus instalaciones de alto voltaje. *Vda.*

*de Dávila v. Fuentes Fluviales*, 90 D.P.R. 321 (1964); *Ramos v. Aut. de Fuentes Fluviales*, 86 D.P.R. 603 (1962). Sin embargo, la Autoridad no es una aseguradora absoluta de todo accidente o riesgo imaginable. Ello se funda en el conocimiento universalmente aceptado acerca de que toda persona de inteligencia y experiencia promedio sabe sobre el peligro de la electricidad. *Vda. de Dávila v. Fuentes Fluviales*, supra, pág. 376. Véanse, además: *Méndez Purcell v. A.F.F.*, 110 D.P.R. 130 (1980); *Santos Ocasio v. A.F.F.*, 103 D.P.R. 564 (1975); *Rosario Crespo v. A.F.F.*, 94 D.P.R. 834 (1967).

Según esta normativa, la Autoridad fue negligente al mantener sus líneas eléctricas y el transformador instalados a una distancia que no satisfacía los requisitos de seguridad de los códigos vigentes. No obstante, distinto a la conclusión de la ilustrada sala sentenciadora, Torres Solís también lo fue. La prueba revela que se dio cuenta de que el poste presentaba una situación distinta: los cables telefónicos corrían sobre el transformador. T.E., pág. 11. Sabía que pasaban líneas eléctricas y que la corriente puede causar la muerte; simplemente, según analizó la situación, creyó erróneamente que no le iba a pasar nada al situar la escalera al lado contrario del transformador. T.E., págs. 30–31. En resumen, aunque sabía que el transformador podía causarle daño (T.E., pág.31), optó por continuar sus labores. Es evidente que Torres Solís adoptó, de forma consciente, una decisión y asumió un riesgo calculado que lamentablemente no impidió el accidente. Concluimos que incurrió en negligencia comparada ascendente a un cincuenta por ciento (50%).

## IV

La estimación y valoración del dolor físico y mental de Torres Solís descansa en la sana discreción del juzgador de instancia con ánimo reparador y, en ausencia de circuns-

tancias especiales, sin propósitos punitivos. *Rivera v. Rossi*, 64 D.P.R. 718, 721 (1945). Su determinación ha de estar presidida por una serena reflexión y una evaluación. *Toro Mercado v. P.R. & Amer. Ins. Co.*, 87 D.P.R. 658 (1963). Por estar en la mejor posición para evaluar sus elementos visibles e intangibles, de ordinario respetaremos esa decisión. Sólo intervendremos si es exagerada o muy baja. *Sanabria v. E.L.A.*, 132 D.P.R. 769 (1993); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975).

En el caso de autos se impugnan por ser excesivos los ochenta mil dólares ($80,000) de Torres Solís y los veinte mil dólares ($20,000) de su esposa Elizabeth.

Sobre el particular, la ilustrada sala sentenciadora concluyó:

> Las graves quemaduras sufridas por el demandante, su extremadamente doloroso tratamiento médico y hospitalario, su estadía de dieciocho (18) días en el Centro Médico, su prolongada terapia diaria después de ser dado de alta, la torcedura o el "sprain" de los músculos de la espalda, su terapia e *incapacidad residual*, sus sufrimientos y angustias mentales y morales, *depresión emocional*, pérdida de ingresos y *merma de la capacidad para generar ingresos*, el Tribunal los valora en la suma total de $80,000. (Énfasis suplido.) Sentencia de 13 de noviembre de 1990, pág. 10.

Esa apreciación está ampliamente avalada por la prueba. La naturaleza de los daños, el cúmulo de tribulaciones y las complicaciones posteriores, sumado al hecho de que el accidente dejó en Torres Solís una huella física y emocional que durará toda su vida, nos mueve a sostener la cuantía concedida. Tampoco intervendremos con la de su esposa Elizabeth.

## V

La Autoridad argumenta que la ilustrada sala sentenciadora erró al no resolver la demanda contra tercero pre-

sentada contra la Telefónica en la que le pedía que satisficiera cualquier suma que tuviera que pagarle a Torres Solís *et al.* Funda su reclamo en la *Cláusula de Indemnización y Relevo* contenida en el Art. XXI del *Contrato de Uso Mancomunado, la cual* dispone:

> Cada parte será responsable por los daños, pérdidas y gastos resultantes de la negligencia o acciones de cada parte que surgen o que sean incidentales al trabajo realizado bajo ese Contrato.
>
> Cada parte, para si, sus agentes, empleados, sucesores y cesionarios, consiente a proteger, *compensar* y librar *a la otra parte*, sus oficiales, agentes, empleados, sucesores y cesionarios *de responsabilidad por todo género y tipo de daños, pérdidas, demandas, reclamaciones, acciones o causa de acciones*, junto con toda y cualquier pérdida, gastos y costas derivados o relacionados al mismo, que traiga *cualquier persona* o personas, y que surja o que de cualquier manera se *deriva o es incidental al trabajo* realizado o por realizarse, y las operaciones llevadas a cabo por el causante, sus oficiales, agentes y empleados, y sus subcontratistas y sus oficiales, agentes y empleados, o cualquier otra persona, compañía o corporaciones bajo este contrato, por *virtud de lesiones personales, incluyendo la muerte, y daños a la propiedad de cualquier género o tipo, surgiendo de cualquier causa*, no empece que esas lesiones, muertes o daños son el resultado de o se alega que son el resultado de la *negligencia* del causante, sus oficiales, agentes o empleados, o de los *subcontratistas*, sus oficiales, agentes o empleados, o que es el resultado o se alega que fuera el resultado de la *negligencia concurrente* de la otra parte, sus oficiales, agentes o empleados y el causante, sus oficiales, agentes o empleados y/o los subcontratistas, sus oficiales, agentes y empleados, y el causante, a costo propio, responderá por cualquier pleito o demanda incoada contra la otra parte y que sea basado en cualquier alegada lesión, muerte o daño, y pagará todos los daños, costas y gastos incluyendo honorarios de abogado, en relación a o que en alguna instancia resultasen del mismo. (Traducción y énfasis nuestros.)

En términos generales, este tipo de cláusula permite a una parte ser resarcida y protegerse de cierto riesgo que lo coloca sobre la otra; así se garantiza que será compensada por cualquier pérdida o negligencia. C.M. Devlin, *Indemnity and Exculpation: Circle of Confusion in the*

*Courts,* 33 Emory L.J. 135, 141 (1984). Al fijarse esa responsabilidad contractual, las partes anticipan el ámbito de sus obligaciones y planifican de acuerdo con ello. C.M. Pisano, *Judicial Interpretation of Indemnity Clauses,* 48 La. L. Rev. 169 (1987).

Una cláusula de indemnización y relevo obliga el reembolso por cualquier pérdida, daño o responsabilidad en que la otra persona incurra, mientras actúe a su requerimiento o beneficio. Ese resultado se impone aun cuando podría no ser primariamente responsable —en el sentido de culpabilidad— pero lo es contractualmente. R.L. Meyers III y D.A. Perelmann, *Risk Allocation Through Indemnity Obligations in Construction Contracts,* 40 S.C. L. Rev. 989, 990–991 (1989).

La cláusula puede asumir una forma o integrar varias de un acuerdo para proteger contra alguna pérdida, sea causada por la propia negligencia, la de otro o de un tercero o para proteger de la responsabilidad frente al otro o a los terceros. Devlin, *supra,* pág. 141; Pesano, *supra,* pág. 172.

Como regla general, salvo una legislación que las prohíba, las partes están en libertad de negociarla, incluso los varios grados de responsabilidad, a saber, única negligencia —concurrente entre las partes— y la absoluta. Si la intención es clara, los tribunales la aplicarán a menos que sean contrarias al interés público. Meyers y Perelmann, *supra,* pág. 992.

Igual enfoque subsiste en Puerto Rico. El Art. 4 del Código Civil, 31 L.P.R.A. sec. 4, en lo pertinente, visualiza que "[l]os derechos concedidos por las leyes son renunciables, a no ser esta renuncia contra la ley, el interés o el orden público, o en perjuicio de tercero". La renuncia debe ser *clara, terminante e inequívoca,* más aún cuando se exonera de responsabilidad a una persona por sus futuros actos negligentes. *Getty Refining & Marketing v. Puerto Rico,*

*etc.*, 531 F. Supp. 396, 400 (D. P.R. 1982). Véanse: *Chico v. Editorial Ponce, Inc.*, 101 D.P.R. 759, 778 (1973); *Cabrera v. Doval*, 76 D.P.R. 777, 781 (1954).

## VI

■ A tono con estos principios, de su faz, la cláusula contractual de indemnización y relevo pactada recíprocamente por la Autoridad y la Telefónica no atenta contra el orden público ni la ley; además, su lenguaje es claro, terminante e inequívoco. Ciertamente no estamos ante una situación en la cual exista una desproporción en la fuerza de negociación entre los contratantes. "Un factor importante en la determinación de la validez de una cláusula de relevo depende de la fuerza en la negociación de cada uno de los contratantes. Si no se encuentran en igualdad de condiciones y de fuerza, de manera que una parte se encuentra obligada a aceptar el relevo de responsabilidad por negligencia de la otra parte, el relevo es nulo". *Chico v. Editorial Ponce, Inc.*, supra, pág. 779.

Aquí la cláusula impone a cada entidad responsabilidad por los daños que cause el uso de los postes y las exonera de responsabilidad. Se trata de una cláusula bilateral, en la que cada una acuerda relevar de responsabilidad a la otra e indemnizarla en cualquier suma que esté obligada a pagar. No está sujeta a grados de responsabilidad.

Estamos, pues, ante un caso de responsabilidad *contractual*, en el cual la Telefónica no puede oponerle a la Autoridad su condición e inmunidad de patrono estatutario. Erró la ilustrada sala sentenciadora al desestimar la demanda de la Autoridad contra la Telefónica.

## VII

La Autoridad fue temeraria. A raíz de investigar el accidente supo que la situación fáctica existente era en extremo peligrosa, pues estaban colocados erróneamente unos cables de alto voltaje y telefónicos, a alturas incorrectas —incluso su transformador— todo ello en contravención a las normas de seguridad correspondientes.

De acuerdo con la jurisprudencia vigente, era evidente su responsabilidad, aun cuando fuera comparada. No obstante, sin admitirlos francamente ni hacer una oferta de sentencia, prolongó el pleito innecesariamente. *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713, 719 (1987); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 739–740 (1984); *Raoca Plumbing v. Trans World*, 114 D.P.R. 464 (1983).

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López y la Juez Asociada Señora Naveira de Rodón concurrieron con el resultado sin opinión escrita. El Juez Asociado Señor Fuster Berlingeri no intervino.