*20 Opinión concurrente emitida por la
Jueza Presidenta Señora Fiol Matta.
Concurro con la mayoría de este Tribunal porque surge diáfanamente del contrato que firmaron las partes que la obligación de indemnizar(1) y mantener indemne(2) que asumió la parte recurrida, Ray Engineers, P.S.C. (Ray Engineers) hacia Posadas de Puerto Rico Associates, L.L.C. h/n/c Condado Plaza Hotel (Posadas) incluye la obligación de asumir la representación legal de esta en reclamaciones relacionadas a los trabajos de remodelación y mejoras para los cuales se contrató a Ray Engineers. Por esta razón, la controversia en este caso reviste una naturaleza enteramente contractual que puede ser atendida sin recurrir a ninguna otra fuente de autoridad que no sea nuestro Código Civil. No puedo emitir un voto de conformidad porque el método de adjudicación utilizado en la Opinión Mayoritaria es errado. El que este tipo de cláusulas de indemnización, llamadas hold harmless en inglés, sean comunes en Estados Unidos, no significa que sea necesario recurrir a jurisprudencia estadounidense para resolver la controversia que se nos plantea, cuando nuestro ordenamiento provee los mecanismos adecuados para atenderla.
I
La Opinión de la mayoría expone correctamente los hechos de este caso. Por esta razón resumiremos muy brevemente los hechos pertinentes.
Según un contrato de servicios, firmado con Posadas el 21 de noviembre de 2005, Ray Engineers acordó actuar *21 como contratista para la renovación y remodelación del Hotel Condado Plaza, propiedad de Posadas. El contrato incluyó la remodelación del área de la entrada y del vestíbulo del hotel, conocida como el “redondel” o el “porta-cochere”. Ray Engineers, en su capacidad de “arquitecto de récord” del proyecto, se obligó, entre otras cosas, a: (1) preparar y certificar los planos finales arquitectónicos y de ingeniería para el área del redondel; (2) incluir en los planos arquitectónicos la preparación, el tratamiento y la terminación de todas las superficies, incluyendo los pisos y las elevaciones; (3) asegurarse de que todos sus diseños, documentos y servicios cumplieran con las leyes y los reglamentos locales y federales; (4) revisar los dibujos del contratista para verificar que cumplieran con las especificaciones preparadas por el arquitecto (Ray Engineers), y (5) observar el proceso de construcción e informar de cualquier desviación del contratista respecto a los planos y el contrato de remodelación o de las normas de buena práctica en la construction.(3)
Junto a todas estas obligaciones, Ray Engineers suscribió una cláusula de indemnidad o hold harmless agreement. Esta cláusula, contemplada en la Sec. 12.2.3.1 del contrato, señala textualmente lo siguiente:
The Architect [Ray Engineers] shall defend,(4) indemnify and hold harmless the Owner [Posadas], Owner’s Lender, Owner’s affiliated companies, Owner’s consultants and their respective officers, directors, employees and agents (the “Indemnitees”), for all claims, damages, losses, fees, expenses and costs (including but not limited to legal fees and expenses, and court mediation, and arbitration costs) that arise as a result, in whole or in part, of the intentional acts, negligence, errors, omissions, or failure to perform by the Architect, its employees, its agents, or its Consultants except for that portion of such damages, losses, fees, expenses and costs that are caused solely by the negligence of Owner.(5)
*22 El 5 de enero de 2008, la Sra. María Burgos López sufrió una caída en la entrada del vestíbulo del Hotel Condado Plaza, que fue remodelado por Ray Engineers. Se alegó en la demanda que la caída ocurrió cuando la señora Brugos López perdió el balance debido al encintado que se había utilizado durante los trabajos de remodelación. Esto provocó que la bajada o el escalón fuera totalmente imperceptible, ya que no se habían utilizado colores distintos ni había ninguna otra indicación que ayudara a detectar su existencia.
La demanda contra Posadas y Ray Engineers se presentó el 7 de enero de 2009. Se incluyeron alegaciones específicas contra Ray Engineers por negligencia en su intervención directa en el diseño o por la construcción defectuosa del área donde tuvo lugar el accidente que, según se alega, creó una condición peligrosa que puso en riesgo la seguridad de los visitantes y clientes del Hotel Condado Plaza. Antes de presentarse la demanda, la señora Burgos López envió una carta, el 4 de abril de 2008, en la cual le reclamó a Posadas una indemnización por los daños provocados por la caída que sufrió en los predios del Hotel Condado Plaza. Posadas, confiando en el texto de la cláusula pactada, envió una carta a Ray Engineers el 7 de octubre de 2008 para solicitarle que diera cumplimiento estricto a lo pactado en la cláusula de indemnidad, y procediera a defender a Posadas ante la reclamación de la señora Burgos López. El 7 de enero de 2009, el mismo día en que se presentó la demanda, Ray Engineers contestó la misiva negándose a defender a Posadas. Luego de ser emplazada el 14 de enero de 2009, Posadas insistió en que Ray Engineers la defendiera de la reclamación y le envió una nueva carta, junto con copia de la demanda, para que la representara legalmente en el proceso. Nuevamente Ray Engineers se negó y alegó que para que se activara la cláusula de indemnidad, era necesario demostrar primero su negligencia.
*23 II
A. La Opinión Mayoritaria reconoce que nos encontramos ante una controversia de índole contractual. Expresa, incluso, que en el pasado este Tribunal ha validado acuerdos y cláusulas de indemnización o liberación de responsabilidad, conocidas como hold harmless agreements o indemnity clauses.(6) Además, la Opinión Mayoritaria reconoce la naturaleza mixta del derecho en nuestra jurisdicción, advirtiendo la necesidad de actuar cuidadosamente al analizar y adoptar normas del common law en nuestro ordenamiento legal de manera que no terminemos desnaturalizando los principios civilistas que rigen en muchas de sus materias.(7) Sin embargo, acto seguido, afirma que en el presente caso resulta imperioso servirse del desarrollo de la doctrina y jurisprudencia del common law para interpretar y estudiar la obligación de defender en el contexto de la industria de la construcción.(8) Esta acción se justifica en que, según señala la Opinión, estos contratos tienen cláusulas adoptadas de contratos modelos preparados por organizaciones profesionales de la industria de la construcción en Estados Unidos. Después de este análisis, la Mayoría del Tribunal concluye que, en este caso, es válido incorporar los desarrollos estadounidenses en tomo a las cláusulas de indemnización en los contratos de construcción, “por entender que son acertados, adecuados y cónsonos con nuestro sistema[...]”.(9)
Este análisis metodológico, que toma prestadas innecesariamente las soluciones o los fundamentos que ofrece el derecho común anglosajón o common law por entender que el derecho puertorriqueño no provee una solución especí *24 fica al problema,(10) se aleja de lo que debe ser la mejor práctica en nuestra jurisdicción en la cual, como todos conocemos y reconoce la Opinión Mayoritaria, convergen las tradiciones jurídicas del derecho civil y el common law.(11) El método utilizado por la Opinión Mayoritaria busca apoyo innecesariamente en jurisprudencia estatal y federal estadounidense para resolver una controversia adscrita al campo de las obligaciones y los contratos y, por lo tanto, perteneciente a nuestra tradición civilista. Esto es un reflejo de lo que el jurista español José Puig Brutau llamó el “curioso fenómeno del doble razonamiento”.(12) Según Puig Brutau, este fenómeno se manifiesta en la necesidad que creen tener los tribunales puertorriqueños, incluido este Tribunal, de justificar sus conclusiones, según los conceptos y las doctrinas de ambos sistemas legales.(13) Este doble razonamiento crea confusión en los actores legales que deben interpretar y aplicar el derecho puertorriqueño, dando la falsa impresión de que la ley no es suficiente para validar una determinación judicial sino que es necesario el respaldo de la jurisprudencia del lugar de origen de la norma.
No se trata de sentir aversión por la introducción en nuestro Derecho de elementos de otros sistemas jurídicos o de insistir en un purismo civilista que sea estéril e impida el *25 desarrollo del Derecho puertorriqueño. Por el contrario, los préstamos jurídicos representan un aspecto familiar de las culturas jurídicas modernas.(14) Por esta razón, “[1]os contornos originales de la figura en el país nativo afectan naturalmente su sentido en el país prestatario, pero a fin de cuentas es la cultura de éste, las circunstancias del medio en que se inserta la figura, las que definirán su significado y su rumbo”.(15) Así, el recurso al préstamo jurídico es válido y resulta una herramienta útil cuando las circunstancias del caso lo ameritan. Lo que no es lícito es la idea, durante tanto tiempo alimentada por opiniones poco agraciadas de este Tribunal, que si adoptamos una institución o concepto del derecho común anglosajón —en su versión estadounidense— estamos obligados por la interpretación que los tribunales de dicho país hayan dado a esta, sin que se permita que nuestras condiciones particulares le impriman perfil propio.(16) En tiempos pasados este Tribunal facilitó el proceso de desvirtuar nuestro derecho civil, entremezclándolo y confundiéndolo con el derecho común angloamericano al adoptar innecesariamente doctrinas, figuras o normas de esa tradición jurídica. Estos tiempos de asimilación y, en palabras del Ledo. José Trías Monge, de “embobamiento colonial”, ya superados, tuvieron la consecuencia de cambiar el significado de nuestros códigos y leyes, desmereciendo el desarrollo del derecho autóctono puertorriqueño.(17) Tal y como señaló en una ocasión el otrora Juez Asociado de este Tribunal, José Benjamín Ortiz Ortiz: “[d]ebemos estudiar los sistemas legales extranjeros desde el punto de vista de nuestro propio ambiente. Debemos crear, transformar, establecer nuevos principios y nuevos métodos jurídicos que se adapten a nuestro puertorriqueñismo sin que ello implique *26 que debamos rechazar la influencia de sistemas foráneos de derecho”.(18)
La técnica de derecho comparado que utiliza la Opinión Mayoritaria es una alternativa que, ante un caso adecuado, podemos emplear para servirnos del derecho común angloamericano.(19) Nos ayuda en la medida en que nos muestra cómo otros ordenamientos han atendido distintos problemas, pero contrario al uso que le da la Opinión Mayoritaria, no debe suplantar los entendidos y preceptos de nuestro derecho civil.(20) Sin embargo, es importante señalar que en el caso de epígrafe realmente no hay una ley, figura jurídica o institución de derecho común angloamericano que se haya adoptado en nuestra jurisdicción. El hecho que señala hoy la Mayoría de que el contrato en controversia tiene un lenguaje modelo, según preparado por la industria de la construcción de Estados Unidos no es suficiente para adoptar interpretaciones de tribunales estadounidenses sobre su significado y alcance. Eso sería suponer que nuestros tribunales están obligados a interpretar contratos que se realicen en Puerto Rico, y a los que aplica por supuesto nuestro Código Civil, utilizando metodologías ex-trañas a nuestro ordenamiento por el simple hecho de que se tomó como ejemplo el lenguaje utilizado en determinada jurisdicción o industria. Por supuesto que es válido el ejercicio, como derecho comparado, de examinar el modo en que los tribunales estadounidenses interpretan obligaciones contractuales como las del presente caso. Lo que no es necesario ni aceptable es adoptar sus soluciones por esa sola razón, sobre todo cuando nuestro ordenamiento provee para desarrollar una norma propia que haga justicia a las partes. En el caso de epígrafe., nos encontramos ante un pacto entre dos individuos, realizado en Puerto Rico y su *27 jeto a las normas legales dispuestas por nuestro Código Civil en materia de obligaciones contractuales. Además, el temor de la Mayoría de que interpretemos la cláusula en controversia utilizando nuestras normas generales de derecho contractual y buena fe parecen ser infundadas. Esto, ante la contundente realidad de que la obligación de defender en el contexto de la controversia de epígrafe, no tiene un significado distinto o particular a lo que se entiende generalmente por defensa legal en otros contextos. Siendo esto así, es aún más patente lo innecesario que resulta recurrir a soluciones foráneas para resolver una controversia para la cual nuestro sistema civilista provee una respuesta justa.
B. El Código Civil de Puerto Rico regula en su Libro IV, sobre las obligaciones y los contratos, las relaciones que se establecieron entre Posadas y Ray Engineers con la firma del contrato de 21 de noviembre de 2005. Nuestro Código Civil parte de una metodología que se sustenta en la interpretación de normas mediante la analogía, la deducción lógica de soluciones específicas a partir de normas y conceptos generales, y la utilización de principios generales de derecho. De estos recursos deben echar mano los tribunales puertorriqueños al resolver controversias de carácter civil, recurriendo al préstamo jurídico únicamente en casos en que la ley, figura o institución jurídica haya sido importada.(21) Como ya vimos, aún en estos casos se debe ejercer la prudencia y buscar la manera de adecuar estas figuras y normas foráneas a las condiciones, realidades y normas de nuestro sistema jurídico.
Tal y como señaló Posadas en su alegato, el Art. 1044 del Código Civil establece que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes y deben cumplirse según estos.(22) Además, nuestro Código *28 Civil dispone que para que exista un contrato deben concurrir el consentimiento de las partes, objeto cierto que sea materia del contrato y la causa de la obligación.(23) Por otro lado, para que los contratos sean válidos, sus cláusulas no pueden ser contrarias a la ley, la moral y el orden público.(24)
Sin embargo, la controversia de este caso no gira en torno a la existencia del contrato pactado.(25) Lo que está en controversia es la interpretación de la cláusula de indemnización e indemnidad o hold harmless que se firmó como parte del contrato de 21 de noviembre de 2005. Posadas argumenta que, de acuerdo con la primera oración de la cláusula, Ray Engineers está obligado a “defender, indemnizar y mantener libre de daños [indemne]” a Posadas, sus oficiales, agentes y consultores, de “toda reclamación, daños, pérdidas, cuotas, pagos y costos”. (Traducción nuestra). Ello incluye, pero no está limitado a, gastos y costas legales que sean el resultado en todo o en parte de los actos intencionales, negligencia, errores u omisiones de Ray Engineers,(26) desde la presentación de una demanda en su contra que guarde relación a los trabajos de mejoras y remodelación. Por otro lado, Ray Engineers se negó a defender a Posadas y argumentó, de acuerdo con el lenguaje de la propia cláusula, en su parte final, que primero debía demostrarse que Ray Engineers incurrió en actos intencionales, negligencia, errores u omisiones que provocaron los daños alegados. Como se puede apreciar, tenemos dos interpretaciones distintas del mismo texto contractual.
Para resolver esta controversia debemos analizar las normas de nuestro Código Civil en materia de interpretación de los contratos. Comenzamos con la primera oración *29 del Art. 1233 del Código Civil: “Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas”.(27) Ese mismo artículo nos aclara que si las palabras del contrato fueran contrarias a la intención de las partes esta debe prevalecer.(28) Además, la intención de las partes debe juzgarse atendiendo a los actos de las partes que sean coetáneos y posteriores al contrato.(29)
El Código Civil también establece una serie de normas para interpretar cláusulas con diversos sentidos y palabras que tengan distintos significados. A esos efectos dispone que cualquiera que sea la generalidad de los términos usados en un contrato, no deben entenderse comprendidos en el mismo cosas distintas a aquellas sobre las que las partes se propusieron contratar.(30) Además, si alguna cláusula admite diversos sentidos o significados, deberá observarse el más adecuado para que esta surta el efecto que las partes acordaron.(31) Por último, si una misma palabra tiene diversas acepciones o significados, se debe utilizar el significado que sea más satisfactorio dada la naturaleza y el objeto del contrato.(32)
C. Además de las normas sobre la interpretación y validez de los contratos que hemos expuesto, para resolver esta controversia contractual debemos prestar atención a la norma firmemente establecida en nuestro derecho según la cual las partes están obligadas por la buena fe en la negociación, el perfeccionamiento y el cumplimiento de sus obligaciones contractuales. Nuestro Código Civil incorpora este principio general de derecho al disponer que las partes se obligan, desde el perfeccionamiento de los contratos, “no *30 sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley”.(33) Sobre este precepto, el profesor Michel Godreau Robles explica que se trata, no tanto del estado mental de las partes contratantes, sino de sus actuaciones. Así, los actos de las partes se deben evaluar a la luz de un criterio o de un estándar normativo, independientemente de que los contratantes, de hecho, crean o no que están actuando correctamente.(34) Se trata de la llamada buena fe objetiva, que es la que más se ha asociado al campo del cumplimiento contractual.(35) Por otro lado, el tratadista Diez-Picazo define la buena fe contractual como “la lealtad en el tratar, el proceder honrado y leal. Supone el guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella; supone un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes”.(36) En Prods. Tommy Muñiz v. COPAN este Tribunal expresó:
“La buena fe ... impone a las partes que tratan o negocian un arquetipo de conducta social, lealtad y fidelidad a la palabra dada ... y consiste en que cada parte de la relación precontractual se entreg[ue] confiadamente a la conducta leal de la otra. Fía y confía en que ésta no le engañará.... Las partes tienen la obligación de comportarse según la buena fe en el sentido de que a ella incumbe la carga de una lealtad recíproca de conducta socialmente valorable y exigible”. (Corchetes en el original y énfasis suplido).(37)
*31 Ahora bien, para identificar lo que debe ser el comportamiento de las partes para cumplir con el deber de buena fe en materia de las obligaciones contractuales, se tiene que analizar el asunto a la luz de la propia naturaleza de la relación contractual y de los valores e intereses que deben protegerse en esa relación.(38) Como el contrato es el producto de una relación voluntaria entre las partes, en virtud de la cual un contratante persuade al otro a través de promesas que generan expectativas, el interés que se busca proteger al exigir que las partes observen el principio de la buena fe es el deber de actuar de manera leal.(39) Así, el conocimiento de las expectativas legítimas que generaron los actos de los contratantes es lo que justifica que se imponga el deber de actuar de manera leal: “Ausente dicho conocimiento, la forma de comportarse de una persona frente a otra podrá regirse por principios éticos basados en la exigencia de actuar correctamente, pero ello no requerirá necesariamente el tipo de comportamiento que encarna el valor superior de lealtad”.(40)
Según Godreau Robles, el deber de lealtad que busca proteger el concepto buena fe en materia contractual puede implicar un comportamiento que va más allá del mero actuar correcta u honestamente y en ocasiones puede rebasar incluso el marco de la realización de la prestación.(41) Por último, no debe quedar ninguna duda que la obligación de *32 observar el principio de la buena fe existe no solo en la fase de negociación y perfeccionamiento del contrato, sino también en el desarrollo y cumplimiento de las obligaciones pactadas. Así lo expresa el tratadista Diez-Picazo al establecer que las partes “deben adoptar un comportamiento leal en toda la fase previa a la constitución de tales relaciones; y que deben también comportarse lealmente en el desenvolvimiento de las relaciones jurídicas ya constituidas entre ellas”.(42)
La obligación de actuar de buena fe en el cumplimiento de las obligaciones se recoge en los códigos civiles de otros países que comparten nuestra tradición civilista en materia contractual. Así, el Art. 1258 del Código Civil español, al igual que nuestro Art. 1210, establecen que las partes están obligadas no solo al cumplimiento de lo expresamente pactado, sino también a todas las demás consecuencias que sean conformes a la buena fe según la naturaleza de la obligación. El Código Civil suizo de 1907, aún vigente con enmiendas, dispone en su Artículo 2, primera oración, que se requiere a todos ejercer sus derechos y cumplir sus obligaciones de acuerdo con las normas de la buena fe.(43) De igual forma el Art. 1366 del Código Civil italiano ex-presa que: “[e]l contrato debe ser interpretado según la buena fe”(44) y en su Art. 1375 dispone que el contrato debe cumplirse según las normas de la buena fe.(45) (Traducción nuestra). El Tribunal de Casación italiano ha establecido en su doctrina legal —Giurisprudenza— que el recurso a la *33 buena fe contractual tiene como base un criterio objetivo, fundamentado en el criterio de la lealtad recíproca en la conducta de las partes, protegiendo la confianza que cualquiera de las partes coloca en el significado de las declaraciones de la otra.(46) Así, cuando persiste una duda sobre el significado real de una declaración contractual, se debe recurrir a interpretarlo según las normas de la buena fe.(47) Además, la doctrina legal italiana reconoce que la buena fe es un criterio que sirve para excluir la utilización de un significado unilateral, forzado o contrastante a la confianza que la persona común puede depositar en las declaraciones del contrato.(48)
Vemos como otros ordenamientos jurídicos que comparten nuestra tradición civilista regulan de modo análogo al nuestro las obligaciones que la buena fe impone a los contratantes al momento de perfeccionar y cumplir sus obligaciones contractuales. En ese sentido, y manteniendo lo anterior en mente, no podemos olvidar que nuestro Código Civil también establece que el cumplimiento de las obligaciones contractuales no puede dejarse al arbitrio de uno solo de los contratantes.(49)
III
Las disposiciones de nuestro Código Civil que hemos repasado establecen un marco lógico y ordenado del cual podemos derivar una solución justa para la controversia planteada ante nosotros. Así, las normas de este cuerpo legal son suficientes en sí mismas para determinar las obligaciones surgidas entre Posadas y Ray Engineers y cuándo estas se activan.
*34 Primeramente, las partes pactaron en el contexto de la remodelación del área del redondel o “porta-cochere” del Hotel Condado Plaza, propiedad de Posadas. La remodelación de cualquier estructura conlleva, en la mayoría de los casos, el inicio de obras de construcción en las cuales se remueven estructuras viejas y se hacen planos de las nuevas estructuras o componentes arquitectónicos que se añadirán. Como vimos, según lo expresamente pactado en el contrato de 21 de noviembre de 2005, Ray Engineers se obligó a prestar sus servicios profesionales para realizar los planos de la obra, supervisar que los trabajos se realizaran conforme a lo establecido por estos y al estándar de buenas prácticas en la construcción. Además, Ray Engineers se obligó a escoger las terminaciones que se le darían a las superficies. La naturaleza de los servicios pactados implica la realización de unas obras de construcción, lo que conlleva que puedan surgir situaciones peligrosas que pongan en riesgo la seguridad de las personas que utilizan las instalaciones. Ante esto, es natural que el dueño de la obra pacte con el contratista o proveedor de servicios una cláusula en la cual se le garantice al dueño que se le indemnizará o protegerá y defenderá legalmente de cualquier demanda, reclamación, daños, o gastos que surjan como parte de los trabajos realizados, los cuáles el contratista se comprometió a realizar siguiendo los estándares aceptados por la profesión.
Como cuestión de umbral, este pacto no es contrario a ninguna ley, la moral o el orden público. Como señala la Opinión Mayoritaria, este tipo de cláusulas ya han sido validadas en el pasado en nuestra jurisdicción. Ahora bien, en el caso de epígrafe, existe controversia en torno a si la cláusula de indemnidad pactada entre Posadas y Ray Engineers se activa en el momento en que se presentó la demanda en contra de estos o, como sostiene Ray Engineers, una vez se determine que en efecto los daños ocurrieron por su culpa o negligencia.
*35 El texto en el idioma inglés de la cláusula comienza diciendo: “[t]he Architect shall defend, indemnify and hold harmless the Owner”. Añade que dicha obligación se activará “for all claims, damages, losses, fees, expenses and costs [...] that arise as result, in whole or in part, of the intentional acts, negligence, errors, omissions, or failure to perform by the Architect”. Vemos que el texto claro de la cláusula establece categóricamente que Ray Engineers tenía la obligación de defender a Posadas ante reclamaciones judiciales relacionadas a actos, voluntarios o negligentes, del contratista. El término defender se define como “[a]mparar, librar, proteger”.(50) Sin embargo, en otra de sus acepciones, defender también significa “abogar, alegar en favor de alguien”.(51) Ahora bien, acoger la interpretación propuesta por Ray Engineers y concluir que su obligación de “defender” no se activa hasta tanto se determine que, en efecto, fue negligente, restaría todo sentido a la cláusula puesto que es imposible abogar o alegar en favor de alguien una vez el proceso judicial ha terminado. Como vimos, los términos pactados en un contrato deben ser interpretados en su acepción que sea más conforme a la naturaleza y objeto del contrato y que sea el más adecuado para que produzca el efecto deseado por las partes.(52)
Por otro lado, al momento de pactar, Posadas confió en el significado de las palabras que se expresaron en el contrato y en las actuaciones posteriores de las partes. No surge del expediente del caso que, antes que la señora Bur-gos López demandara, Ray Engineers hubiera presentado algún reparo, objetado o intentado clarificar el texto de las obligaciones pactadas en la cláusula de protección a favor de Posadas. En este sentido, la carta que le envió Posadas a Ray Engineers el 7 de octubre de 2008, en la cual le notifica de la reclamación extrajudicial que le hizo la se *36 ñora Burgos López, y la segunda carta que le envió el 26 de enero de 2009, esta vez con copia de la demanda presentada en su contra, arrojan luz sobre las intenciones de las partes al momento de pactar y la confianza que depositó Posadas en lo escrito expresamente en el contrato. Surge de estos hechos que la expectativa creada en Posadas era que Ray Engineers se encargaría de su defensa en cualquier reclamación relacionada a los trabajos de remodelación que se llevaron a cabo en el Hotel Condado Plaza y en los cuales intervino esa compañía. La interpretación que propone Ray Engineers exige que exista una determinación de culpa o negligencia en su contra para que las obligaciones de la cláusula se activen. Esto frustraría completamente las ex-pectativas que de buena fe se crearon en Posadas, sobre todo ante el hecho indiscutible de que en el presente caso no hubo determinación de negligencia, toda vez que ambas partes transaron con la señora Burgos López y la reclamación entre Posadas y Ray Engineers se resolvió mediante sentencia sumaria.
Dado lo anterior, la interpretación de la cláusula en controversia que sugiere Ray Engineers resultaría en que, contrario a lo expresamente pactado y a las expectativas generadas en Posadas, esta tendría que asumir su defensa, los gastos, las costas y los daños que tuvo que pagar a terceros por hechos en los que estaban directamente implicados los servicios que Ray Engineers se comprometió a realizar ajustándose al “buen criterio ingenierir. Este resultado es completamente contrario al deber de lealtad que le impone la buena fe a Ray Engineers y vulnera la confianza que depositó Posadas en este. Tal actuación no es aceptable en nuestro ordenamiento. Además, implicaría dejar al arbitrio de una de las partes el cumplimiento de la obligación pactada, pues un contratante situado en la misma posición que Ray Engineers, y sujeto a la misma obligación, podría siempre transar con la parte demandante de manera tal que el tribunal nunca hiciera una determinación final sobre su responsabilidad.
*37 Siempre que sea compatible con la naturaleza del contrato o las obligaciones asumidas por las partes, se debe entender que la obligación de defender y mantener indemne pactada en una cláusula de indemnidad, como la de este caso, se activará en el momento que se presente una demanda en la que se alegue que los daños y perjuicios son el resultado de la culpa, negligencia, error u omisión de la parte que se obligó a indemnizar y proteger de toda reclamación a la otra parte. De esta manera, queda resguardada la confianza recíproca y las expectativas generadas en cada una de las partes contratantes. Sin embargo, hay que precisar que la obligación de defender y proteger que asume una de las partes será exigible hasta tanto surja del descubrimiento de prueba, o durante cualquier otra etapa del litigio, que los daños alegados son en realidad el resultado de la culpa o negligencia de la parte protegida. De ser este el caso, a solicitud de parte el tribunal deberá determinar si en efecto existe evidencia concreta que establezca que las defensas de la parte obligada y la parte protegida están encontradas. Esto es así porque el texto expresamente pactado y la obligación de actuar de buena fe y de manera leal entre las partes tienen como resultado que cada cual asuma los costos de su defensa y de los daños que provocó su actuación, reembolsando la parte responsable de los daños los gastos, si algunos, que asumió la otra.(53)

 “Indemnizar” significa “resarcir de un daño o peijuicio”. Diccionario de la lengua española, 22da ed., Madrid, Ed. Espasa Calpe, 2001, T. II, pág. 1266.

 La palabra indemne significa “libre o exento de daño”. íd.

 Apéndice, págs. 24—29.

 La palabra inglesa defend es traducida como “defender, proteger”. SMART Diccionario Español-Inglés, Barcelona, Ed. Océano, 1992.

 Alegato de Posadas, pág. 10.

 Opinión mayoritaria, pág. 8, citando a Natal Cruz v. Santiago Negrón et al., 188 DPR 564, 584-585 (2013), y a Torres Solís et al. v. A.E.E. et als., 136 DPR 302, 314 (1994).

 Opinión mayoritaria, pág. 10.

 íd.

 íd., pág. 16.

 La Opinión mayoritaria pone mucho énfasis en que es necesario recurrir a la jurisprudencia estadounidense porque en Puerto Rico no contamos con una solución específica para el problema que presenta la controversia en este caso. Sin embargo, eso no significa que no podemos derivar una solución justa utihzando las normas de nuestro Código Civil. El método de razonamiento en nuestra tradición civilista se sustenta precisamente en obtener, de normas generales, respuestas para atender controversias específicas.

 J. Trías Monge, El choque de dos culturas jurídicas en Puerto Rico, San Juan, Ed. Equity, 1991. Tal y como señalamos en Valle v. Amer. Inter. Ins. Co., 108 DPR 692, 697 (1979), “[e]n los casos apropiados será lícito el empleo del derecho común en sus múltiples y ricas versiones —la angloamericana, la original británica, la anglocanadiense y otras— a modo de derecho comparado, así como el uso de ejemplos de otros sistemas jurídicos”.

 L. Fiol Matta, Civil Law and Common Law in the Legal Method of Puerto Rico, 40 Am. J. of Comp. L. 783, 792 (1992), citando a J. Puig Brutau, La acción recíproca del Derecho español y del Derecho norteamericano en Puerto Rico, 44 Rev. Der. Pur. 499, 503-505 (1972).

 íd.

 Trías Monge, op. cit., Sec. 5.9, pág. 126.

 íd.

 íd.

 íd., Sec. 5.2, pág. 108.

 B. Ortiz, El Derecho como vehículo de expresión de nuestra cultura, 5 Rev. Leg. y Jur. Asoc. Abo. 133, 136-137 (1940).

 iyías Monge, op. cit., Sec. 13, pág. 409.

 íd.

 Claro está, esto no impide recurrir a fuentes de derecho comparado para propósitos de interpretación y elaboración del derecho propio.

 31 LPRA sec. 2994.

 31 LPRA sec. 3391.

 31 LPRA sec. 3372.

 Como cuestión de hecho, las partes estipularon la existencia del contrato.

 Cláusula 12.2.3.1 del Contrato de 21 de noviembre de 2005. Apéndice, pág. 151.

 31 LPRA sec. 3471.

 íd.

 31 LPRA sec. 3472.

 31 LPRA sec. 3473.

 31 LPRA sec. 3474.

 31 LPRA sec. 3476.

 31 LPRA sec. 3375.

 M. Godreau Robles, Lealtad y buena fe contractual, 58 Rev. Jur. UPR 367, 372 (1989).

 íd.

 Id., pág. 374, citando a L. Diez-Picazo, La doctrina de los propios actos, Barcelona, Ed. Bosch, 1963, pág. 157. Véase Int. General Electric v. Concrete Builders, 104 DPR 871, 875 esc. 4 (1976).

 Prods. Tommy Muñiz v. COPAN, 113 DPR 517, 528 (1982), citando a M. Alonso Pérez, La responsabilidad precontractual, 47 Rev. Crít. Der. Inmob. 859, 888-889 (1971). Además en Ramírez v. Club Cala de Palmas, 123 DPR 339, 346 (1989), expresamos que “[e]l requisito de buena fe es elemental y, como tal, se extiende a la *31 totalidad de nuestro ordenamiento jurídico. ‘El contenido de eticidad de cada acto deberá examinarse a la luz de sus circunstancias particulares, pero el comportamiento conforme a la buena fe es precepto general que abarca toda actividad jurídica’ ”. Citando a Catalityc Ind. Maint. Co. v. F.S.E., 121 DPR 98, 113 (1988), y a Velilla v. Pueblo Supermarkets, Inc., 111 DPR 585, 587-588 (1981).

 Godreau Robles, supra, pág. 379.

 íd., pág. 380.

 íd.

 íd. Godreau Robles señala que el deber de actuar lealmente podría significar que, incluso en casos en los que el incumplimiento pueda estar justificado por haber quedado liberado el deudor —como en el caso en que la imposibilidad de cumplir la obligación haya sido causada por caso fortuito-— el principio de la buena fe podría imponer la responsabilidad si no se atienden las expectativas de la otra parte, como por ejemplo, que se le avise oportunamente del incumplimiento de manera que se puedan evitar daños mayores.

 Diez-Picazo, op. cit., pág. 12.

 Art. 2, Code civil suisse du 10 décembre 1907, filtre préliminaire: “Chacun est tenu d’exercer ses droits et d’exécuter ses obligations selon les regles de la bonne foi. Uabus.manifesté d’un droit n’est pas protégé par la loi.” Disponible en http:// www.admin.ch/opc/fr/classifiedcompilation/19070042/201407010000/ 210.pdf, última visita el 7 de abril de 2015.

 “Interpretazione di buona fede—II contratto deve essere interprétate secondo buena fede”. Art. 1366, Codice Civile italiano. V De Martino, Códice Civile, Commentato con la Giurisprudenza, Roma, Ed. Jandi Sapi, 1983.

 “Esecuzione di buona fede—II contratto deve essere eseguito secondo buona fede”. Art. 1375, Codice Civile italiano. De Martino, op.cit., pág. 1882.

 íd., pág. 1870, discutiendo a Cass. 19 dicembre 1957 esc. 4756 (Giust.Civ.Mass. 1957, 1179); Conf.: Cass. 6 marzo 1969, n. 745.

 íd.

 Cass. 13 dicembre 1978, n. 5939, Giur. it., 1979,1, 1, 1294.

 31 LPRA sec. 3373.

 Diccionario de la lengua española, op. cit., T. I, pág. 715.

 íd.

 Arts. 1236 y 1238 del Código Civil, 31 LPRA secs. 3474 y 3476.

 j¡¡n ja Opinión Mayoritaria se realiza un análisis in pari materia con el campo de los contratos de seguros en Puerto Rico. Citando a PFZ Props., Inc. v. Gen. Acc. Ins. Co., 136 DPR 881, 896 (1994), se expresa que según ese contrato de seguro, “ ‘[l]a obligación de la compañía aseguradora de asumir la representación legal surgirá cuando de una interpretación liberal de las alegaciones surja la posibilidad de que el asegurado está protegido.por la póliza expedida, independientemente de cuál sea la adjudicación final del caso’ ”. Véase Opinión mayoritaria, pág. 12. Aunque este análisis puede ser correcto y resulta útil aplicar la misma norma a la situación que presenta este caso, hay serias limitaciones a la analogía propuesta por la opinión mayoritaria. Por ejemplo, debemos tener cuidado de no confundir las obligaciones de una aseguradora frente a su asegurado con las obligaciones que asumieron las partes en este caso, ya que cuando el evento está contemplado en la cubierta del asegurado, la aseguradora asume su representación legal en la misma posición que el asegurado, con todas sus obligaciones y defensas hasta el monto cubierto por la póliza. Sin embargo, en el caso ante nuestra consideración, estamos ante dos partes privadas que suscribieron un contrato de servicios —no de seguros— en el que se incluyó una *38 cláusula de indemnidad o hold, harmless. Según los propios términos de la cláusula, esta obligación será exigible siempre que los daños alegados hayan sido producto de la culpa o negligencia de la parte obligada a proteger a la otra. Por lo tanto, si durante el litigio se descubre que en efecto los daños alegados no fueron provocados por la parte obligada a proteger, surgiría una situación anómala, no contemplada en la relación aseguradora-asegurado, donde una parte tendría que asumir defensas encontradas. Es decir, por un lado tendría que cumplir con su obligación de defender y mantener indemne a la parte con la que se obligó, y por el otro, tendría que defenderse a sí misma de una responsabilidad que no le corresponde.